IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CORETTA STEWART, | CASE NO. 1:25-CV-00903-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION & ORDER** |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Coretta Stewart challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry dated May 6, 2025). The parties then consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #5). For the reasons below, I **REVERSE** the Commissioner's decision and **REMAND** the matter for proceedings not inconsistent with this decision.

## PROCEDURAL BACKGROUND

Ms. Stewart applied for DIB and SSI in October 2015, alleging she became disabled on July 14, 2014, due to severe depression and a panic disorder. (Tr. 588, 590-91). After the claim was denied initially and on reconsideration, Ms. Stewart requested a hearing before an Administrative Law Judge. (Tr. 398-99, 430-31, 480-82). In September 2017, Ms. Stewart (represented by counsel)

1

and a vocational expert (VE) testified before an ALJ. (Tr. 294-332). In February 2018, the ALJ determined Ms. Stewart was not disabled. (Tr. 432-50).

The Appeals Council granted Ms. Stewart's request for review, vacated the hearing decision, and remanded the case to the ALJ for a new decision. (Tr. 453-54). The ALJ held a second hearing and, in January 2019, determined Ms. Stewart was not disabled. (Tr. 272-93). The Appeals Council denied Ms. Stewart's request to review that decision. (Tr. 1-3).

Ms. Stewart then challenged the ALJ's second decision in this court. (Tr. 1618-31). The parties jointly requested remand to the ALJ for a new decision. (Tr. 1651). On remand, the Appeals Council reviewed the matter, vacated the ALJ's 2019 decision, and remanded the case to a new ALJ for an adequate evaluation of the consultative psychological examiner's opinion, the state agency psychological consultants' opinions, and the treating sources' psychological opinions. (Tr. 1658-60).

The new ALJ held a third hearing and, in June 2021, issued a new, partially favorable decision finding Ms. Stewart was not disabled before May 1, 2021, but was disabled as of that date. (Tr. 1568). The Appeals Council denied Ms. Stewart's request to review that decision. (Tr. 1519-25).

Ms. Stewart filed another complaint in this court challenging the unfavorable part of the ALJ's 2021 decision and again the parties jointly requested remand for further proceedings. (Tr. 4329). On remand, the Appeals Council vacated the unfavorable part of the 2021 decision and returned the case to the ALJ for an adequate evaluation of Ms. Stewart's symptoms. (Tr. 4334-36).

Following a fourth hearing, the ALJ concluded Ms. Stewart was not disabled from July 14, 2014, through the date of the decision, April 23, 2024. (Tr. 4233-49). At Ms. Stewart's prompting,

the ALJ amended the decision on April 16, 2024 to reflect that Ms. Stewart was not disabled from July 14, 2014 to April 30, 2021. (Tr. 4194-228). The Appeals Council denied her request for review of the ALJ's decision, so the 2024 amended decision constitutes the Commissioner's final decision. (Tr. 4188; *see also* 20 C.F.R. §§ 404.981, 416.1481). Ms. Stewart timely filed this action. (ECF #1).

FACTUAL BACKGROUND

**I.      Personal and Vocational Evidence**

Ms. Stewart was 47 years old on her alleged onset date and 57 years old at the final hearing. (Tr. 366). She graduated from high school and had past relevant work experience as a door greeter and a collections agent. (Tr. 1850-52).

**II.      Relevant Medical History[1]**

**2014.** In July 2014, Ms. Stewart presented for a Diagnostic Assessment at the Charak Center for Health and Wellness (Charak). (Tr. 780). There, she described discreet periods of intense fear during which she experiences heart palpitations, stomach distress, nausea and vomiting, lightheadedness, and dizziness. (*Id.*). She reported frequent crying, racing thoughts, negative ruminations, and problems falling asleep. (Tr. 787-88). She described her mood as depressed, anxious, and irritable and she endorsed varying attention and concentration issues and feelings of anger and frustration. (Tr. 789, 791). She was cooperative but restless. (Tr. 789).

In August, Ms. Stewart presented for a psychiatric evaluation at Charak and was "very tearful," and reported bursting into tears "all the time." (Tr. 756). She endorsed depression,

---

[1]      Ms. Stewart argues the ALJ erred in finding her not disabled between July 14, 2014, and April 30, 2021. My summary of the medical record is limited to that timeframe.

anxiety, monthly panic attacks, insomnia, and chronic pain from standing all day at work. (Tr. 756-57). Charak's psychiatrist, Rakesh Ranjan, M.D., noted Ms. Stewart was oriented, well-groomed, and cooperative. (Tr. 760). She denied delusions, compulsions, and hallucinations; displayed logical and circumstantial thought processes and normal memory; and had average insight and fair judgment. (Tr. 761). Dr. Ranjan diagnosed recurrent depression and prescribed Viibryd for depression and Ambien for sleep.[2] (Tr. 763).

In September, Ms. Stewart informed Dr. Ranjan that she was on leave through October from her job as a door greeter due to constant stress and pain in her legs. (Tr. 745). She described strained relationships with her siblings after her father's death; crying all the time because she was still grieving for her father; depression, mood swings, and anxiety with weekly panic attacks; insomnia with difficulty staying asleep and repetitive nightmares about the deaths of her father, sister, and niece; and decreased energy and impaired concentration. (*Id.*). Dr. Ranjan noted she was well-groomed, cooperative, and depressed with full affect; had a logical thought process with impaired attention and concentration, normal memory, and average insight and fair judgment. (Tr. 746-47). Dr. Ranjan described her condition as "stable," without improvement or deterioration. (Tr. 749).

Ms. Stewart met with Dr. Ranjan again on October 29 and discussed not feeling mentally or physically ready to return to work on November 1. (Tr. 739). She described difficulty falling asleep after she ran out of Ambien and cried during the appointment. (*Id.*). She also reported

---

[2]       Viibryd is a brand name for vilazodone, a serotonin modulator used to treat depression. *Vilazodone, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a611020.html (last accessed March 24, 2026). Ambien is a brand name for zolpidem, a sedative-hypnotic used to treat insomnia (difficulty falling asleep or staying asleep). *Zolpidem, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a693025.html (last accessed March 24, 2026).

getting agitated quickly. (Tr. 742). Ms. Stewart endorsed symptoms of depression, anxiety and irritability, insomnia with repetitive nightmares about her relatives' deaths, decreased energy, and impaired concentration. (Tr. 739). Dr. Ranjan observed that Ms. Stewart was well-groomed and cooperative, had a depressed and angry mood with full affect, and displayed impaired attention and concentration, normal memory, and good insight and judgment. (Tr. 740-41). He restarted Ms. Stewart's medications. (Tr. 742).

On November 5, Ms. Stewart told Dr. Ranjan she had not resumed working and described feeling stressed, anxious, and edgy because her employer repeatedly called her about returning to work. (Tr. 737). She described Viibryd as partially effective for her depression but reported difficulty staying asleep. (Tr. 734). In addition, she reported anxiety, continued nightmares, decreased energy, and impaired concentration. (*Id.*). Dr. Ranjan observed Ms. Stewart was cooperative but depressed, angry, irritable, and anxious. (Tr. 735-36). He also noted logical thought process, impaired attention and concentration, normal memory, and good insight and judgment. (Tr. 736).

In December, Ms. Stewart ran out of medication 15 days before her appointment with Dr. Ranjan at which she described worsening depression and anxiety, panic attacks, irritability, insomnia, and impaired concentration. (Tr. 729). Dr. Ranjan noted Ms. Stewart was cooperative, with a depressed, irritable, and anxious mood and full affect. (Tr. 731). She displayed a logical thought process but impaired attention, concentration, and impulse control. (*Id.*).

**2015.** Ms. Stewart stopped treatment with Dr. Ranjan after 2014 because she started to feel better but then returned in October 2015 when she became severely depressed. (Tr. 719). Dr. Ranjan enrolled her in medication management, therapy, and case-management services at

Charak. (*Id.*). Ms. Stewart reported insomnia, depression, low mood, impaired concentration, anxiety, and some paranoia. (*Id.*). She was tearful, explained she wants to "burst into tears all the time," and has felt this way since losing her father, sister, and niece. (*Id.*). Dr. Ranjan noted she was cooperative with a depressed and anxious mood and full affect. (Tr. 725). He prescribed Belsomra for insomnia.[3] (Tr. 726).

**2016.** In March 2016, Ms. Stewart returned to Dr. Ranjan where she denied improvement with Viibryd and endorsed insomnia, depression, mood swings, irritability, and anxiety with three-to-four panic attacks a week. (Tr. 843). Dr. Ranjan noted Ms. Stewart was cooperative with a euthymic mood and full affect, good insight and judgment, and normal impulse control. (Tr. 845). He discontinued Viibryd and prescribed Brintellix for depression and Sonata for insomnia.[4] (Tr. 847). Ms. Stewart's counselor noted her mood was depressed and agitated. (Tr. 841).

In April, Ms. Stewart returned to Charak and reported emotional instability, excessive crying, symptoms of depression and anxiety, mood swings, irritability, racing thoughts, and insomnia. (Tr. 849). She was cooperative and had a logical thought process with average insight and fair judgment, but her mood was depressed, anxious, and irritable with constricted affect. (Tr. 851-52). She was prescribed hydroxyzine for anxiety.[5] (Tr. 853).

---

[3]     Belsomra is a brand name for suvorexant, a central nervous system depressant used to treat insomnia. *Suvorexant, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a614046.html (last accessed March 24, 2026).

[4]     Brintellix is a brand name for vortioxetine, a serotonin modulator used to treat depression. *Vortioxetine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a614003.html (last accessed March 24, 2026). Sonata is a brand name for zaleplon, a hypnotic used to treat insomnia. *Zaleplon, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a601251.html (last accessed March 24, 2026).

[5]     Hydroxyzine is an antihistamine used to relieve anxiety and tension. *Hydroxyzine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682866.html (last accessed March 24, 2026).

Ms. Stewart met with Dr. Ranjan again on May 5, and reported she did not pick up her medications because she was stressed and did not want to wait 45 minutes to get them. (Tr. 865). She endorsed depression, mood swings, anxiety, irritability, racing thoughts, and insomnia. (Tr. 865-66). Ms. Stewart returned to Dr. Ranjan on May 19 and reported her medications were not effective. (Tr. 855). She endorsed poor sleep, feeling paranoid about people breaking into her home, depression, mood swings, anxiety, irritability, racing thoughts, and frequent crying. (*Id.*). She was well-groomed and cooperative, had logical thought processes, was depressed and anxious with constricted affect, and had average insight and good judgment. (Tr. 857). Dr. Ranjan increased her dose of Brintellix. (Tr. 858).

In June, Ms. Stewart began attending group therapy in a partial hospitalization program. (*See* Tr. 874). During her counseling session in July, Ms. Stewart was "notably anxious," spoke rapidly, and had racing thoughts. (Tr. 881). She reported stopping her medications because she feared potential side effects and did not want to feel "like a zombie." (*Id.*).

**2017.** In January 2017, Ms. Stewart cried frequently during her counseling session and could not stop crying since stopping her medications. (Tr. 1023). She also endorsed insomnia, paranoia, and rarely leaving her home. (*Id.*). At her next counseling session in February, Ms. Stewart reported decreased sleep, poor concentration, fatigue, increased irritability, sadness, and head and body aches. (Tr. 1022). Her counselor noted Ms. Stewart was tearful throughout the session. (*Id.*).

On February 6, Ms. Stewart met with Dr. Ranjan and reported excessive crying (including in the grocery store), severe depression, mood swings, anxiety, panic attacks in social situations, irritability, insomnia, low energy, and impaired concentration. (Tr. 1017). Ms. Stewart was

"somewhat impaired" in her ability to abstract, grossly impaired in her reasoning ability, and had a depressed and anxious mood with full affect. (Tr. 1018-19). Dr. Ranjan prescribed Remeron.[6] (*See* Tr. 1014).

Ms. Stewart met with Dr. Ranjan again on February 15 and reported doing "okay" with her medication without side effects. (Tr. 1012). She endorsed depression, mood swings and anxiety, irritability, low energy, and all-over pain. (*Id.*). She was cooperative with a logical thought process and depressed mood with full affect, and she displayed average insight and fair judgment. (Tr. 1013). Dr. Ranjan prescribed Cymbalta.[7] (*See* Tr. 1010).

Ms. Stewart returned to Dr. Ranjan on February 23 and again reported doing "okay" on her current medication. (Tr. 1008). She endorsed depression, chronic pain (that contributed to her depression), mild anxiety, and low energy. (*Id.*). Dr. Ranjan noted she was cooperative, had logical thought processes, and was depressed with full affect. (Tr. 1009). That same day, Ms. Stewart met with her counselor and reported difficulty sleeping and significant pain in her joints and back. (Tr. 1007). The counselor noted Ms. Stewart was tearful during the session. (*Id.*).

During her next counseling session in March, Ms. Stewart reported stopping her medications because they caused diarrhea, stomach pain, nausea, and dizziness. (Tr. 1006). She described ongoing sleep difficulty, and her counselor noted she appeared more agitated that day. (*Id.*). Later that month, Ms. Stewart reported to Dr. Ranjan that she had back pain and was feeling

---

[6]     Remeron is a brand name for mirtazapine, an antidepressant used to treat depression and maintain mental balance. *Mirtazapine, MedlinePlus,* http://medlineplus.gov/ druginfo/meds/a697009.html (last accessed March 24, 2026).

[7]     Cymbalta is a brand name for duloxetine, a selective serotonin and norepinephrine reuptake inhibitor used to treat depression, generalized anxiety disorder, excessive worry, and tension. *Duloxetine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a604030.html (last accessed March 24, 2026).

depressed and anxious. (Tr. 1002). Dr. Ranjan noted she was cooperative with a depressed mood with full affect, logical thought processes, and average insight and fair judgment. (Tr. 1003). Ms. Stewart attended five chiropractic sessions in March for chronic back pain (Tr. 964-68) and she was tearful in one appointment (Tr. 964).

She returned to Dr. Ranjan in April and reported not yet picking up her medications because she was in so much pain that she struggled to leave the house. (Tr. 998). Ms. Stewart reported severe depression, mild irritability, insomnia, low energy, and back pain. (*Id.*). Dr. Ranjan noted she was cooperative with a depressed mood with full affect, logical thought processes, and average insight and fair judgment. (Tr. 999). She also met with her counselor and reported back and joint pain, crying spells, and negative thoughts. (Tr. 997).

In May, Ms. Stewart met with Dr. Ranjan and reported feeling depressed. (Tr. 992). She described irritability, low energy, impaired concentration, and back pain. (*Id.*). She was cooperative with a depressed mood with full affect, logical thought processes, and average insight and fair judgment. (Tr. 993). Dr. Ranjan refilled her prescriptions for Cymbalta and melatonin. (Tr. 994). During her counseling session the same day, she reported her medication was not helping and endorsed mood swings, crying spells, and irritability. (Tr. 996). Ms. Stewart's counselor described her as notably dysthymic and tearful. (*Id.*).

At the end of May, Ms. Stewart endorsed depression, mood swings, irritability, low energy, restless sleep, crying spells, and chronic all-over pain. (Tr. 988). Dr. Ranjan noted she was cooperative, depressed with full affect, and had logical thought processes. (Tr. 989). That day, Ms. Stewart reported ongoing back pain and nightmares to her counselor, who noted she was dysthymic and tearful. (Tr. 987).

9

At her June counseling session, Ms. Stewart was again notably dysthymic and tearful. (Tr. 986). She reported difficulty sleeping, crying spells, significant back pain, agitation, and nightmares. (*Id.*).

In July, Ms. Stewart's case manager called her about her missed appointment. (Tr. 1425). Ms. Stewart was crying and said she was having a bad day. (*Id.*). The case manager eventually settled her down and had her laughing. (*Id.*). Ms. Stewart called her case manager twice more that month to talk. (Tr. 1422-23). She did not want to make an appointment with her therapist because she did not want to go outside or be bothered by anyone. (Tr. 1422).

In August, Ms. Stewart met with Dr. Ranjan and reported severe depression, mood swings, irritability, anxiety, insomnia, nightmares, low energy, impaired concentration, episodic memory loss, and chronic neck and back pain. (Tr. 1028-29). Dr. Ranjan observed a cooperative demeanor, depressed and anxious mood with full affect, and logical thought processes. (Tr. 1029). He continued Cymbalta and Remeron and prescribed brexpiprazole and trazodone.[8] (*See* Tr. 1229). Ms. Stewart attended three counseling sessions in August, where she reported depression and chronic body pain. (Tr. 1233, 1416, 1421).

On August 21, Ms. Stewart's case manager and a nurse met with her for "crisis management." (Tr. 1406). At the time, Ms. Stewart was "very distraught" and upset about her conditions. (*Id.*). She endorsed feeling "very depressed," having difficulty sleeping, staying on task, socializing, and concentrating. (*Id.*). That day, Ms. Stewart also met with Dr. Ranjan and Dewan

---

[8]        Brexpiprazole is an atypical antipsychotic used to treat depression alongside another antidepressant medication. *Brexpiprazole, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a615046.html (last accessed March 24, 2026). Trazodone is a serotonin modulator used to treat depression. *Trazodone, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a681038.html (last accessed March 24, 2026).

Williams, RN, for medication management. (Tr. 1408). There, she reported struggling with medication compliance because she cannot keep food or medication down. (*Id.*). She was tearful and struggled to express herself. (*Id.*). She reported severe depression, mood swings, irritability, racing thoughts, anxiety, insomnia, low appetite and energy, impaired concentration, struggling to control her emotions, chronic low back pain, excessive crying, and memory loss. (*Id.*). She was cooperative, had logical thought processes, and was anxious with full affect. (Tr. 1411). Two days later, Ms. Stewart's case manager called her for a welfare check and noted she was in a better mood. (Tr. 1405). Also in August, Ms. Stewart attended three chiropractic appointments and was in tears at two of them. (Tr. 1277-79).

In September, Ms. Stewart met with Dr. Ranjan and reported depression, mood swings, irritability, anxiety, panic attacks, difficulty staying asleep, low energy, impaired concentration, being tearful about everything, and pain that causes lots of stress. (Tr. 1227). She had a circumstantial thought process, depressed mood, full affect, and good insight and judgment. (Tr. 1228). Dr. Ranjan increased Remeron to help her depression and sleep. (Tr. 1229). That same day, Ms. Stewart called her case manager in tears, demanding to know why her case manager was being changed and refusing to switch. (Tr. 1225). She went "on and on" about the situation, becoming very agitated and yelling. (*Id.*). The case manager calmed her but noted she "is becoming very paranoid and anxious." (*Id.*). Ms. Stewart reported lots of physical pain and was tearful during her counseling session. (Tr. 1232).

In October, Ms. Stewart told Nurse Williams that she stopped taking one of her medications due to increased urination. (Tr. 1220). She reported inability to eat or sit still, severe depression, mood swings, irritability, anxiety in social situations, low energy, impaired

11

concentration, and chronic low back pain. (*Id.*). Mental status examination showed cooperative demeanor, circumstantial thought processes (flight of ideas), a depressed and anxious mood with full affect, and average insight and judgment. (Tr. 1221). That day, Ms. Stewart also met with her case manager where she reported getting out of bed every day and eating meals despite presenting as severely depressed. (Tr. 1219).

In December, Ms. Stewart attended a counseling session where she reported isolating herself due to increased irritability. (Tr. 1209). She also met with her case manager and reported crying spells and depression. (Tr. 1204). The case manager noted she was engaged and maintained good eye contact but became confused about certain information and was easily emotional. (*Id.*). Ms. Stewart presented for medication management that month and described severe depressive symptoms, mood swings, irritability, racing thoughts, moderate-to-high anxiety with weekly panic attacks, difficulty sleeping, and impaired concentration. (Tr. 1205). She showed an anxious mood with full affect, impaired concentration and attention, and average insight and fair judgment. (Tr. 1206). She was prescribed Latuda for her mood and depressive symptoms.[9] (Tr. 1207).

Ms. Stewart returned for a medication management appointment at the end of December and reported feeling "a pinch" better after the change in medication. (Tr. 1196). Despite improvement, she continued to have panic attacks and daily crying spells. (*Id.*). She also endorsed depressive symptoms, anxiety in social situations and panic attacks triggered by driving, difficulty staying asleep, and low energy. (*Id.*). Ms. Stewart was cooperative with a depressed mood and full

---

[9] Latuda is a brand name for lurasidone, an atypical antipsychotic used to treat symptoms of schizophrenia and bipolar disorder. *Lurasidone, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a611016.html (last accessed March 24, 2026).

affect, average insight, and fair judgment. (Tr. 1197). During her counseling session that day, Ms. Stewart endorsed increasing irritability and self-isolation. (Tr. 1366).

**2018.** In January, Ms. Stewart attended three counseling sessions during which she was tense and tearful (Tr. 1190, 1357), described feeling like a zombie and crying often (Tr. 1186), and was anxious and overwhelmed. (Tr. 1357).

In February, Ms. Stewart was late to meet her case manager because she "barely wanted to get out of bed" that day. (Tr. 1173). During two counseling sessions that month, she was sad and tearful (Tr. 1350); endorsed severe mood swings; aggressive behaviors including yelling, screaming, throwing and breaking things; explosive rage; and frequent crying spells. (Tr. 1169). She was easily agitated, which affected her focus and concentration. (*Id.*). She spent most of her time alone at home. (*Id.*). The counselor noted she had a dramatic demeanor, restless motor behavior, poor insight, and fair judgment. (Tr. 1170). She was distractible, spoke with rapid and pressured speech, and her mood was sad, depressed, angry, hostile, anxious, and expansive, with a flat labile affect. (Tr. 1171).

In March, Ms. Stewart was tearful and reported increased depression, mood swings, irritability, anxiety in social situations, panic attacks, easy frustration, anger issues, and poor sleep in her medication-management appointment. (Tr. 1161). When she ran out of medication, she resorted to taking leftover medication samples but could not state what she was taking. (*Id.*). She displayed a depressed mood with full affect, circumstantial thought processes, fair insight, and fair judgment. (Tr. 1162-63). She was diagnosed with bipolar disorder. (Tr. 1161). At counseling, she was tearful and anxious. (Tr. 1100). Her case manager had to convince her to go to the hospital for

13

high blood pressure. (Tr. 1156). Ms. Stewart refused an EKG because she was nervous and afraid of the outcome. (Tr. 1159). She was prescribed blood-pressure medication. (Tr. 1156).

In May, Ms. Stewart was anxious, overwhelmed, and tearful. (Tr. 1099, 1145). She reported having a panic attack at the grocery store and endorsed difficulty sleeping. (Tr. 1145).

In June, Ms. Stewart sought additional mental-health services with Ohio Guidestone, including community psychiatric support treatment (CPST) and telephone counseling. (Tr. 1431, 1436; *see also* Tr. 1437, 1448, 1451). During her diagnostic evaluation, Ms. Stewart reported her history of anxiety, depression, and bipolar disorder and endorsed associated functional limitations. (*See* Tr. 1427-28). For instance, she became overwhelmed and abandoned a full cart of groceries, pulled over while driving after panicking, and has frequent uncontrollable crying spells. (*Id.*). She was anxious with full affect, cooperative but distracted, and maintained normal eye contact but was restless. (Tr. 1430).

In regular counseling, Ms. Stewart was notably anxious, worried, and tearful and reported crying daily and being anxious around others. (Tr. 1144, 1143, 1318). She described becoming more agitated and verbally abusive towards her family (Tr. 1143) as well as struggling to control her mood and crying (Tr. 1318). She was irritable and anxious with her case manager. (Tr. 1317). During medication management, she cried several times and reported increased anxiety, mood swings, depression, irritability, panic attacks, racing thoughts, anxiety, difficulty staying asleep, low energy, and impaired concentration. (Tr. 1313).

In July, Ms. Stewart was anxious and tearful in counseling and described crying spells and racing thoughts. (Tr. 1312). Later, she was fatigued, reported no activity, and worried her high blood pressure caused anxiety and decreased energy. (Tr. 1311). At medication management, she

reported irritability, moderate-to-severe depression, poor sleep, anxiety in social situations, and chronic back pain. (Tr. 1307-08). She was cooperative and had circumstantial thought processes, euthymic mood with full affect, fair attention and concentration, and fair insight and judgment. (Tr. 1308). Her provider increased Latuda and prescribed Buspar.[10] (Tr. 1309).

In August, Ms. Stewart was feeling up and down and had mood swings, irritability, racing thoughts, moderate-to-severe anxiety, and repetitive nightmares. (Tr. 1302). She was cooperative but tearful, had a circumstantial thought process, depressed mood with full affect, and fair insight and judgment. (Tr. 1303). She was similarly tearful and anxious during counseling. (Tr. 1301, 1298).

In September, Ms. Stewart reported during medication management big mood swings, irritability, depression, anxiety, difficulty sleeping, and variable energy levels. (Tr. 1294). She was cooperative but tearful, depressed and anxious with full affect, and had good insight and judgment. (Tr. 1294-95). On September 10, Ms. Stewart was admitted to the emergency room with an acute kidney injury from dehydration. (Tr. 1468). During a psychiatric consultation, she was tearful; described crying spells, poor sleep, decreased energy, depressed mood, inattentiveness, and poor concentration; and reported not taking Latuda because depression decreased her appetite, and she could not keep anything down. (Tr. 1473-74). On examination, the provider noted engaged behavior, moderately impaired memory, impaired attention and concentration, depressed mood with congruent effect, and limited judgment. (Tr. 1477). She was prescribed Seroquel

---

[10]    Buspar is a brand name for buspirone, an anxiolytic used to treat anxiety disorders. *Buspar, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a688005.html (last accessed March 24, 2026).

alongside her Remeron, melatonin, and Buspar and her Latuda was discontinued.[11] (Tr. 1473). She reported her new medications at her next medication-management appointment, and she was sleeping better but still depressed, irritable, and anxious and had mood swings, panic attacks, low energy, intrusive thoughts, difficulty concentrating, and self-isolated. (Tr. 1289). She was also well-groomed and cooperative. (Tr. 1290).

In an October counseling session, Ms. Stewart reported crying spells and restlessness from severe back pain. (Tr. 2201). She was anxious and tearful and said her anxiety worsened with back pain. (*Id.*). At medication management, she was tearful and reported constant crying spells, moodiness, irritability, racing thoughts, anxiety, insomnia, and low energy. (Tr. 2191). She was cooperative but depressed with full affect and she walked bent over from back pain. (Tr. 2192-93). Her dosages of Seroquel and Remeron were increased. (Tr. 2195).

In November during counseling, Ms. Stewart described trouble sleeping, increased anxiety, and episodes of sadness due to back pain. (Tr. 2190). She was tearful and anxious with a flat affect. (*Id.*). Later, she reported feeling overwhelmed and anxious and her counselor noted mood lability and crying episodes during the session. (Tr. 2189).

In December, Ms. Stewart described in counseling daily angry outbursts and pent-up emotion and anger about her father's death. (Tr. 2186) Her counselor again recorded that she was tearful, sad, distraught, angry, depressed, and volatile and displayed loose associations. (*Id.*). During medication management, she reported back pain, continued depression, mood swings, irritability, racing thoughts, fluctuating anxiety, difficulty staying asleep, low energy, and impaired

---

[11]    Seroquel is a brand name for quetiapine, an atypical antipsychotic used to treat schizophrenia, bipolar disorder, and major depressive disorder. *Quetiapine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a698019.html (last accessed March 24, 2026).

concentration. (Tr. 2179). She was noted to be cooperative but depressed with constricted affect. (Tr. 2180). She was prescribed Vraylar and her Remeron dosage was increased for sleep.[12] (Tr. 2179).

**2019.** In January, Ms. Stewart reported during medication management her chronic pain worsened her depression. (Tr. 2165). Since her last visit, she was bed-ridden for several days and endorsed irritability, mood swings, racing thoughts, anxiety, panic attacks with vomiting and sweating, difficulty falling asleep due to pain, and paranoia. (Tr. 2165-66). She was noted to be cooperative but with some persecutory delusions and was depressed with full affect. (Tr. 2166). She reported similar trouble sleeping from pain to her case manager and was anxious about not being able to work. (Tr. 2163). She had difficulty expressing herself because she was crying throughout the session. (*Id.*). The case manager remarked she "[c]ontinues to lack the necessary coping skills to manage depression, irritation, and anger." (*Id.*). She also reported beginning pain management treatment for her back pain. (Tr. 2032). She was "crying non-stop" during the interview and noted to have significant depression. (*Id.*).

In February, Ms. Stewart started seeing Jarrod Pyle, a Qualified Mental Health Specialist at Charak. (*See* Tr. 2333). She reported mood swings, depression, disrupted sleep, auditory hallucinations, and intense irritability and anger and described throwing a deck of cards in her cousin's face. (*Id.*). In a pain management appointment, she was very tearful and her doctor recommended group physical therapy and discussed coping mechanisms for stress and pain. (Tr. 2050, 2053). During medication management, she reported varying degrees of depression that can

---

[12]     Vraylar is a brand name for cariprazine, an atypical antipsychotic used to treat schizophrenia, bipolar disorder, and major depressive disorder. *Cariprazine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a615050.html (last accessed March 24, 2026).

be severe for days to weeks at a time; frequent crying spells; irritability; fits of anger; racing thoughts; panic attacks with vomiting, palpitations, and shortness of breath; insomnia; impaired concentration; and back and hand pain. (Tr. 2325-26). Her Vraylar was increased. (Tr. 2328).

In March during a medication management appointment, Ms. Stewart endorsed severe depression, mood swings, moderate-to-severe anxiety, poor sleep, low energy, chronic pain in her back and hands, and excessive crying. (Tr. 2316). She was noted to be very emotional. (*Id.*). She was recommended to begin weekly counseling. (Tr. 2319). In another appointment that month she reported panic attacks, fluctuating moods, low energy, poor concentration, memory issues, and excessive crying. (Tr. 2306-07). She explained she sometimes must force herself to do things and gives up easily. (Tr. 2306). Her prescriptions for melatonin and Vraylar were increased. (Tr. 2309).

Notes from Ms. Stewart's session with Mr. Pyle on March 25 showed she was "really down," made poor eye contact, and slouched "possibly due to pain and depressed mood." (Tr. 2299). During medication management, she endorsed "feeling better" but reported some depression, irritability, moderate-to-severe anxiety, insomnia, impaired concentration, and excessive crying. (Tr. 2300-01). She began attending group physical therapy sessions for back pain. (Tr. 2300).

During her April session with Mr. Pyle, Ms. Stewart was described as mildly hostile, disgruntled, and irritated. (Tr. 2287). In medication management, she reported her back pain affected her mood and sleep, and she endorsed moderate-to-severe mood swings, irritability, low

18

energy, poor concentration, nightmares, and excessive crying. (Tr. 2279-80). The provider increased Seroquel, decreased Remeron, and prescribed prazosin.[13] (Tr. 2282).

In May during medication management, Ms. Stewart reported back pain, depression, mood swings, irritability, difficulty staying asleep due to pain, low energy, and poor concentration. (Tr. 2271). Her case manager noted she appeared irritated and angry, was not easily redirected away from her anger, and appeared stressed, "possibly due to missed appointments at the dentist office." (Tr. 2276). In another meeting, she reported an irritable mood, and her case manager noted she did not easily receive feedback, struggled to refocus her negative thoughts, and was mildly resistant to making behavioral changes to better manage her symptoms. (Tr. 2270).

In June, Ms. Stewart reported during medication management that her medications were working but "sometimes the pain overpowers everything else." (Tr. 2263). She endorsed a generally stable mood and improved irritability but reported crying daily, difficulty staying asleep, and low energy due to pain. (*Id.*). In another appointment (combined with psychotherapy), she reported her anxiety was somewhat improved, but her pain continued to make her irritable. (Tr. 2252, 2257). During her session with Mr. Pyle on June 10, he noted she exhibited anger, irritability, and a lack of compassion for others. (Tr. 2260). She also appeared to be in pain, made intermittent eye contact, and was restless in her seat. (*Id.*). In another session with Mr. Pyle on June 17, she reported impulsivity, rage, and self-loathing. (Tr. 2255). He noted she had difficulty sitting still, grimaced, frowned, and blinked rapidly. (*Id.*).

---

[13]     Prazosin is an alpha-blocker typically prescribed to treat high blood pressure. It is also used to treat sleep issues associated with post-traumatic stress disorder. *Prazosin, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682245.html (last accessed March 24, 2026).

At a June pain management appointment Ms. Stewart reported persistent back pain and sleep issues. (Tr. 2061). She reported enjoying her physical-therapy program despite aching and dull back pain. (*Id.*). Between February and June 2019, she attended 16 physical therapy sessions and 5 group physical therapy sessions. (Tr. 2802, 2800, 2798, 2795, 2793, 2792, 2791, 2789, 2787, 2781, 2779, 2778, 2776, 2772, 2770) (in chronological order). Her doctor referred her for a consultation for fibromyalgia. (Tr. 2064).

In her first of three July sessions with Mr. Pyle, Ms. Stewart became very angry when discussing her family relationships and reported "unmanageable physical and emotional pain." (Tr. 2252). Her behavior was angry, with intense eye contact, fist-clenching, and crying. (*Id.*). Later that month, she continued to report extreme pain, and she grunted, groaned, and sobbed in the session. (Tr. 2244). She reported irritability, unmanageable pain, and a lack of self-control in her third session and clenched her fists, sat hunched over, and behaved irritably throughout. (Tr. 2245). Mr. Pyle noted she was resistant to changing her behavior and resorted to anger. (*Id.*).

In October, Ms. Stewart met with Soumya Chatterjee, M.D., and reported intense generalized pain in the joints and muscles of her neck, upper arms, lower back, hands, hips, and thighs. (Tr. 2747). She had tenderness in her shoulders, lower back, and trochanters. (Tr. 2752). Dr. Chatterjee determined Ms. Stewart's answers to the widespread pain scale and symptoms questionnaires met the criteria for fibromyalgia and diagnosed central sensitization. (*Id.*).

**2020.** In January, Ms. Stewart reported in medication management not feeling well after running out of her medications. (Tr. 3059). She endorsed depression, anxiety, and sleep disturbances due to pain. (*Id.*). She was cooperative with a depressed and anxious mood and full affect. (Tr. 3060). She attended group therapy throughout January, where she responded well and

interacted appropriately with others but was easily flustered, irritable, and often cried. (Tr. 3055, 3053, 3047-51, 3028). The therapist noted she "[n]eeds to work on coping skills," "communication," and "anger management skills." (Tr. 3055, 3051). When Ms. Stewart met with Mr. Pyle, he noted she grimaced, moaned, groaned, whimpered, was irritable throughout the visit, and "responded poorly to intervention." (Tr. 3030). In medication management, she reported doing well on her medications but became depressed "when the pain gets bad." (Tr. 3038).

At the end of January, Ms. Stewart attended a session with Mr. Pyle and a group therapy session. (Tr. 3035, 3026). With Mr. Pyle, she reported unmanageable pain, bouts of irritability, anger, and mood swings. (Tr. 3035). The therapist noted Ms. Stewart sat rigidly in her chair, clenched her fists, grimaced, constantly writhed and shifted in her seat, and groaned from pain. (*Id.*). During group therapy, Ms. Stewart was anxious about an upcoming appointment and "needed redirection when becoming upset." (Tr. 3026).

In February during the first of three medication-management appointments, Ms. Stewart reported mood swings, low energy, impaired concentration, chronic pain, and near daily crying spells. (Tr. 3017). Later, she reported racing thoughts, suicidal ideation, thoughts of harming others, depression, and mood swings related to her denied disability application. (Tr. 2997). She also endorsed depression, irritability, anxiety, panic attacks with vomiting, numbness, sweating, and palpitations, low energy, poor concentration, chronic lower back pain, and daily excessive crying. (Tr. 2997-98). On exam, she was cooperative but anxious and depressed with full affect, had a logical thought process, normal attention and concentration, and fair insight and judgment. (Tr. 2998). By the end of the month, she reported racing thoughts, flight of ideas, depression, anxiety, and mood swings. (Tr. 2979). She also endorsed panic attacks, sleep disturbances, low

21

energy, impaired concentration, and daily thigh and back pain. (*Id.*). She was cooperative, euthymic with full affect, and displayed fair insight and judgment. (Tr. 2980). Her medications were initially unchanged (Tr. 3021) but her prescriptions for Remeron and Seroquel were increased at the end of the month (Tr. 2983). During group therapy, she was notably anxious, sad, angry, distressed, and irritable. (Tr. 3005, 2976). She skipped one session and left another early because of pain. (Tr. 3007, 2987). The group leader noted she "needs to work on coping skills" and "anger and emotional regulation." (Tr. 3007, 2974).

In March during medication management, Ms. Stewart reported panic attacks with shortness of breath, palpitations, nausea, vomiting, sweating, racing thoughts, mood swings, anxiety, depression, difficulty falling and staying asleep, low energy, impaired concentration, and daily lower back pain. (Tr. 2953-54). She was cooperative and euthymic with full affect. (Tr. 2954). Her provider increased Remeron, decreased Seroquel, and prescribed Geodon.[14] (Tr. 2958). She called Mr. Pyle and reported feeling mentally tired. (Tr. 2947). He noted she was increasingly irritable, angry, and dismissive of his attempted intervention. (*Id.*). She sobbed over the phone and reported rapidly changing mood swings. (*Id.*). She spoke with her case manager three times on March 24 to report missing her scheduled appointments because of the pandemic. (Tr. 2942, 2944-45). She cried and sobbed, expressed tangential and unrealistic thoughts, and was unwilling to try coping skills, group therapy, telehealth sessions, or change her thinking. (Tr. 2942).

In April during medication management, Ms. Stewart reported racing thoughts, depression, mood swings, anxiety, panic attacks three times a week, low energy, impaired

---

[14]  Geodon is a brand name for ziprasidone, an atypical antipsychotic used to treat schizophrenia and bipolar disorder. *Ziprasidone, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a699062.html (last accessed March 24, 2026).

22

concentration, and daily crying spells. (Tr. 2929-30). Her dose of Geodon was lowered. (Tr. 2933). At the end of April, she reported depression, mood swings, racing thoughts, anxiety, panic attacks, daily back pain, low energy, impaired concentration, and daily crying spells. (Tr. 2919-20). Her symptoms had improved somewhat, and her medications were unchanged. (Tr. 2919, 2923). In her first April session with Mr. Pyle, she reported mood swings, emotional instability, crying spells, and sleep disturbances. (Tr 2927). Mr. Pyle noted she was irritable, resistant, and sobbed and responded negatively to intervention. (*Id.*). Later in April, she told Mr. Pyle she was depressed and irritated; during that session she moaned in pain and was "easily off-topic." (Tr. 2916). She restarted therapy and counseling services through Ohio Guidestone, speaking with her counselor 11 times, where she cried or was distraught during 9 of those sessions due to pain or emotional distress. (Tr. 2353, 3374, 3378, 3256, 3258, 3265, 3268, 3271, 3274, 3277, 3280) (in chronological order).

In May, Ms. Stewart reported to Mr. Pyle being in a good mood and making some progress towards stabilization and pain management. (Tr. 2913). One week later, she reported having angry outbursts. (Tr. 2899). Ms. Stewart spoke to her Ohio Guidestone counselor 9 times in May. (Tr. 3283, 3286, 3289, 3292, 3295, 3241, 3245, 3249, 3298) (in chronological order). During medication management, she reported her symptoms had improved but still endorsed depression, racing thoughts, anxiety, mood swings, panic attacks, insomnia, chronic pain, and excessive crying three to four times a week. (Tr. 2905-06, 2984). Her Geodon and Buspar prescriptions were increased. (Tr. 2898).

In June, Ms. Stewart reported improvement with depression and anxiety though she was not sleeping well due to pain (Tr. 3168-69), and she still had some anxiety, mood swings, racing

23

thoughts, and irritability (Tr. 3346). She was irritable and angry with Mr. Pyle. (Tr. 3167). Later in June she refused to participate in group therapy or attend appointments. (Tr. 3165). But the following day, Mr. Pyle noted she was friendly, with a rapidly changing mood, and some aggressive behavior. (Tr. 3352). During sessions with Mr. Pyle on June 30 and July 14, Ms. Stewart continued to report chronic pain, anger, irritability, depressed mood, and crying spells. (Tr. 3344-45). She was irritable and moderately loud, cried throughout the session, moaned in pain, and struggled to focus on solutions and restructure her thoughts. (Tr. 3344). She spoke with her Ohio Guidestone counselor 12 times in June, during which she sometimes endorsed improvement but more often cried, expressed anger and frustration about family stressors, and endorsed pain. (Tr. 3301, 3304, 3306, 3310, 3313, 3316, 3319, 3322, 3325, 3328, 3497, 3502) (in chronological order).

In July, Ms. Stewart spoke with her Ohio Guidestone counselor 8 times and expressed improved symptoms at times, but more often was upset, anxious, depressed, or angry and cried during the calls. (Tr. 3510, 3514, 3518, 3522, 3526, 3530, 3524, 3542) (in chronological order).

In August, Ms. Stewart reported chronic pain, depression, anxiety, poor sleep, and irritability. (Tr. 3714). To Mr. Pyle, she reported daily depression, chronic pain, and feeling overwhelmed due to the severity of her pain. (Tr. 3713). She began to sob and ended the call because she was going to be sick. (*Id.*). Her pain-management doctor prescribed Lyrica for pain relief.[15] (Tr. 3604). But she reported that Lyrica was not effective enough so her doctor increased her dose of Lyrica and gave her injections for pain relief. (Tr. 3598-99). She spoke with her Ohio

---

[15] Lyrica is the brand name for pregabalin, an anticonvulsant used to relieve neuropathic pain and treat fibromyalgia. *Pregabalin, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a605045.html (last accessed March 24, 2026).

24

Guidestone counselor 9 times in August and was noted to be anxious and crying through most of those calls. (Tr. 3546, 3550, 3554, 3558, 3566, 3570, 3574, 4036, 4039) (in chronological order).

In September, Ms. Stewart reported during medication management she still had pain and was depressed but was doing better after receiving pain medication and felt she could manage. (Tr. 3624). Later in September, her pain-management doctor increased her dose of Lyrica. (Tr. 3594). In two sessions with Mr. Pyle, she was highly irritable, angry, aggressive, crying, volatile, and uncooperative. (Tr. 3622-23). In one session, she vomited while on the phone, was unfriendly, cried loudly, and spoke irrationally. (Tr. 3623). In the other, her moods cycled rapidly, she screeched and cried excessively, and refused to restructure her thoughts. (Tr. 3622). She spoke with her Ohio Guidestone counselor 8 times in September, where she often talked about her physical pain and depression. (Tr. 4048, 4051, 3890, 3893, 3896, 3899, 3902, 3905) (in chronological order).

In October, Ms. Stewart endorsed being "in pain, as usual" during medication management. (Tr. 3615). She complained of impaired sleep, worsened depression, and impaired concentration when in pain and had a panic attack over the weekend. (Tr. 3615-16). She also reported intrusive thoughts because of her pain: "I don't even care if I get hit by a bus." (Tr. 3616). Her provider noted her depressed mood and constricted affect and increased Geodon. (Tr. 3617, 3621). Ms. Stewart spoke with her Ohio Guidestone counselor 13 times in October, where she reported struggling to manage her chronic pain, was often angry or anxious, and cried. (Tr. 3911, 3914, 3917, 3920, 3923, 3926, 3929, 3932, 3935, 3938, 3941, 3944, 3947) (in chronological order). Her counselor noted she makes "progress managing her anxiety until she gets angry and

begins to feel overwhelmed and anxious" and she "seems to have a problem getting along with others and feels that she is not being treated fairly." (Tr. 3932, 3941).

Between October 9 and November 30, Ms. Stewart spoke to Mr. Pyle seven times over the phone and was angry, irritable, disgruntled, easily agitated, and demonstrated severe mood swings. (*See* Tr. 3690-96). She also complained of chronic pain, cried or sobbed, became emotional, grunted from pain, and exhibited paranoid and hostile behavior. (*Id.*). On November 30, she was "oddly overly cooperative" at times but still responded poorly to intervention, displayed vengeful, hostile behavior and "exhibit[ed] no progress." (Tr. 3690).

During November, Ms. Stewart met with her pain-management doctor and continued to report neck and back pain as well as left shoulder pain. (Tr. 3883). She was diagnosed with lumbosacral radiculopathy, multi-level cervical spondylosis without myelopathy, and degenerative joint disease of the left shoulder. (Tr. 3884). She received a steroid injection in her shoulder (*id.*), which provided 70% relief (Tr. 3879). She was prescribed gabapentin.[16] (Tr. 3879). In November, she spoke with her Ohio Guidestone counselor four times and was noted to struggle managing her symptoms. (Tr. 3950, 3953, 3956, 3959) (in chronological order).

In December, she reported doing well with Lyrica. (Tr. 3874). During medication management, she reported an overall stable mood, though she was not having a good day. (Tr. 4071). She was euthymic with full affect and reported normal attention and concentration. (Tr. 4072). Her provider decided to continue her current medications to "maintain appropriate level of functioning" and "prevent[] symptom relapse." (Tr. 4075).

---

[16]     Gabapentin is an anticonvulsant sometimes used to treat nerve pain. *Gabapentin, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a694007.html (last accessed March 13, 2026).

**2021.** In January, Ms. Stewart reported during medication management she was "doing okay" with "good days and bad days." (Tr. 4066). Her medications were beneficial, but her chronic pain harms her mood, especially when her pain is aggravated. (*Id.*). She reported to her pain-management doctor continued pain and the relief from previous injections was wearing off. (Tr. 4158, 4163). She received more injections for muscle pain. (Tr. 4163).

In February, Ms. Stewart reported to her pain-management doctor that the injections provided 90% relief in her arms, but her lumbar muscular pain continued. (Tr. 4157). She received another round of injections in her lumbar area. (*Id.*).

### III.    Relevant Opinion Evidence

In January 2016, Ms. Stewart underwent a consultative psychological evaluation with J. Joseph Konieczny, Ph.D., in connection with her disability application. (Tr. 800-03). There, she reported a history of depression after her father's death, mood swings, insomnia, decreased energy level, and lower back pain. (Tr. 801). Dr. Konieczny noted Ms. Stewart was cooperative but "quite tearful" during the interview. (*Id.*). He opined Ms. Stewart had no significant limits in understanding, remembering, or carrying out instructions or in attention, concentration, and persistence with single- and multi-step tasks. (Tr. 802). He also found she would have diminished tolerance for frustration and diminished coping skills because of her depression, which would impact her ability to respond to typical, simple supervision and interpersonal situations and her ability to respond to typical pressure situations in the work setting. (*Id.*).

Also that month, Ms. Stewart underwent a consultative physical evaluation with Eulogio Sioson, M.D. (Tr. 806-10). There, she reported back and joint pain beginning in 2006. (Tr. 806). She estimated she can walk about 15 minutes, go up or down 10 steps, stand and sit for 2 hours,

and lift and carry less than 10 pounds. (*Id.*). Ms. Stewart walked normally without an assistive device and could get up and down from the exam table. (*Id.*). She lost her balance with heel/toe walking and had some back pain when rising from a squat. (*Id.*). On physical examination, Dr. Sioson noted moderate low-back tenderness and some limited range of motion with pain in the shoulders, dorsolumbar spine, hips, and knees. (Tr. 807, 809-10). Dr. Sioson found no objective findings that would significantly limit her ability to do work-related activities except for limited range of motion from pain. (Tr. 807).

Later that month, state agency medical consultant Esberdado Villanueva, M.D., reviewed the medical records and determined Ms. Stewart could lift and carry 50 pounds occasionally, 25 pounds frequently; stand and/or walk and sit for 6 hours each during an 8-hour workday; occasionally climb ramps, stairs, ladders, ropes, and scaffolds; and frequently stoop, kneel, crouch, and crawl. (Tr. 376-77). In May 2016, state agency medical consultant Elizabeth Das, M.D., affirmed Dr. Villanueva's opinion on reconsideration. (Tr. 408-09).

Again in January 2016, state agency psychological consultant Vicki Warren, Ph.D., reviewed the file and determined Ms. Stewart can understand, remember, and maintain concentration for simple and complex tasks. (Tr. 377). She opined Ms. Stewart is moderately limited in interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintaining socially appropriate behavior and therefore "should be around others on a minimal and superficial basis." (Tr. 377-78). Finally, Dr. Warren noted Ms. Stewart was moderately limited in her abilities to respond appropriately to changes in the work setting, travel in unfamiliar places, and set realistic goals or make plans

independently of others and therefore should "be in a setting with little to no change to routine or environment." (Tr. 378). In May 2016, state agency psychological consultant Katherine Reid, Psy.D., affirmed Dr. Warren's findings, concluding Mr. Stewart "appears capable of superficial interactions with others in the workplace" and of "performing in a routine work setting where changes can be explained in advance." (Tr. 410-11).

Also in May 2016, Dr. Ranjan completed a medical source statement in which he opined Ms. Stewart can:

- Frequently follow work rules, use judgment, maintain regular attendance, relate to co-workers, work in coordination or proximity to others without being distracted or distracting to others, understand remember and carry out detailed but not complex job instructions, same with simple instructions, and relate predictably in social situations;

- Occasionally maintain attention and concentration for extended periods of 2-hour segments, respond appropriately to changes in routine settings, deal with the public, function independently without redirection, understand remember and carry out complex job instructions, socialize, behave in an emotionally stable manner, and leave home on her own; and

- Rarely interact with supervisors, deal with work stress, and complete a normal workday and work week without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.

(Tr. 817-18).

On August 21, 2017, RN Williams (Ms. Stewart's psychiatric nurse in 2017) noted Ms. Stewart suffers from severe panic attacks, struggles to complete activities of daily living, and has chronic pain. (Tr. 1091). RN Williams opined Ms. Stewart faces:

- A moderate limitation in being aware of normal hazards and taking appropriate precautions;

- Marked limitations in understanding and learning terms or procedures; recognizing a mistake and correcting it; identifying and solving problems;

29

using reasoning and judgment for work-related decisions; asking for help when needed; understanding responding to social cues; and responding to requests, suggestions, criticism, correction, or challenges; making plans; and maintaining personal hygiene and attire; and

- Extreme limitations in following 1- and 2-step instructions to carry out a task; describe work activity to someone else; ask and answer questions and provide explanations; sequence multi-step activities; cooperate with others; handle conflicts with others; state own point of view; initiate or sustain conversation; keep social interaction free of excessive irritability, sensitivity, argumentativeness, or suspiciousness; and initiate and perform a task that she understands and knows how to do.

(Tr. 1090-91).

In July 2018, Kim Hart-Ogburn, M.A., LPCC, (one of Ms. Stewart's counselors) completed a medical source statement and noted Ms. Stewart suffered from bipolar disorder, major depressive disorder, generalized anxiety disorder, and insomnia. (Tr. 1250). She opined Ms. Stewart faces:

- Mild limitations in following 1- or 2-step oral instructions to carry out a task; ask for help when needed; stating her own point of view; initiating or sustaining conversation; initiating or performing a task that she understands and knows how to do; completing tasks in a timely manner; changing activities or work settings without being disruptive; working close to or with others without interrupting or disrupting them; setting realistic goals; making plans for oneself independent of others; and maintaining personal hygiene and attire appropriate to a work setting;

- Moderate limitations in understanding and learning terms, instructions, or procedures; describing work activity to someone else; using reason and judgment to make work-related decisions; cooperating with others; keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness; working at an appropriate or consistent pace; ignoring or avoiding distractions while working; sustaining an ordinary routine and regular attendance at work; responding to demands; and being aware of normal hazards and taking precautions; and

- Marked limitations in asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; handling conflicts with others; understanding and responding to social cues; responding to requests, suggestions, criticism, correction, and challenges; working a full day without

30

needing more than the allotted number or length of rest periods during the day; adapting to changes; and managing psychologically-based symptoms.

(Tr. 1249-50).

## IV.    Relevant Testimonial Evidence

Ms. Stewart provided testimony about how her conditions affect her ability to function in four separate hearings.

**A.** **September 12, 2017**. Ms. Stewart suffers from low back pain. (Tr. 318). Her pain is worse when she is depressed. (*Id.*). She also has depression and suffers from crying spells every day, often more than once. (Tr. 316). She can sit and walk for about an hour each before the pain becomes "excruciating." (Tr. 319). She cannot lift a gallon of milk due to pain. (*Id.*). She lives alone. (Tr. 304). She visits with her sister and sister's children twice a month. (Tr. 310). Ms. Stewart cannot stand for long periods of time, so she does some household chores, but her niece and nephew help with the rest. (*Id.*). She can drive short distances to the grocery store and her bank but does not like to drive. (Tr. 305). She has had panic attacks while driving and has needed to pull over to calm herself, usually for two-to-six minutes. (Tr. 306). She also has panic attacks at home once or twice a week and needs 30 to 45 minutes to compose herself after. (Tr. 312-13). She cannot sleep well and has mood swings that are difficult to control. (Tr. 314-15).

**B.** **November 13, 2018**. Ms. Stewart described panic attacks occurring about once a week that cause her whole body to "lock up" and vomit. (Tr. 341-42). Her bipolar depression causes anxiety and makes it difficult for her to comprehend even simple tasks. (Tr. 434). She takes medication to reduce depression and panic attacks, but with varying degrees of effectiveness. (Tr. 343). She continues to have mood swings and four-to-five crying spells a week. (Tr. 344). Her crying spells last one-to-two hours. (Tr. 344). She avoids going to, for instance, the grocery store

31

when she is moody. (Tr. 348). Ms. Stewart also has spinal inflammation in her lower back that constantly aches. (Tr. 348-49). She can stand for about 20 minutes before she needs to sit. (Tr. 349). She cannot lift a gallon of milk due to pain. (Tr. 349). About 10 days a month, she is in so much pain that she cannot leave the house and struggles to dress. (Tr. 350-51). Her physical pain worsens with depression. (Tr. 351).

C.      **April 28, 2021**. Ms. Stewart is always in severe pain. (Tr. 1592-93). She cannot work because of her pain and mental state. (Tr. 1599). She takes medication but it does not help. (*Id.*). She has pain in her shoulders, back, and sometimes her legs. (Tr. 1600-01). She has pain either sitting or standing so she changes position often. (Tr. 1602). She uses a heating pad for relief, but the pain returns when she turns it off. (Tr. 1603). She can stand for about 10 minutes and walk for less than 5 minutes. (Tr. 1604). She cannot lift more than a half-gallon of milk. (Tr. 1604-05). She is quick-tempered and does not comprehend things like she once did. (Tr. 1601). When she becomes frustrated or agitated, she curses and throws things in the house. (Tr. 1606). Her daily activities include reading, doing crossword puzzles, and watching cooking shows. (Tr. 1593). She becomes agitated easily so she will do a crossword puzzle or read for ten minutes then set it down and come back to it later. (Tr. 1594). She makes meals in a crockpot because she cannot stand at the stove long enough to cook a meal. (Tr. 1593). Ms. Stewart's sister, nieces, and nephews will help her with household chores. (Tr. 1595). In general, she goes grocery shopping with her sister. (Tr. 1607). If she has to Uber to the store, she will grab just a few things because she does not like to be in crowds for long. (*Id.*).

D.      **February 15, 2024**. At the final hearing, Ms. Stewart's counsel argued that her conditions require she work in isolation and would have "an extremely reduced ability" to handle

stress and pressure. (Tr. 4270). Counsel also noted Ms. Stewart's pain makes her more irritable and hostile. (Tr. 4271). On examination, Ms. Stewart stated that her back, shoulder, and leg pain was so severe during the relevant period that she cannot concentrate and is irritated by people in general. (Tr. 4274). When she loses her temper, she yells at people and feels ready to fight. (Tr. 4275).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The ALJ follows a five-step evaluation process found at 20 C.F.R. § 404.1520 to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?
2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?
3. Does the severe impairment meet one of the listed impairments?
4. What is claimant's residual functional capacity and can claimant perform past relevant work?
5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the ALJ at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age,

33

education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Stewart had not engaged in substantial gainful activity since July 14, 2014, the alleged onset date. (Tr. 4200). At Step Two, the ALJ identified degenerative disc disease, arthropathies, osteoarthritis/allied disorder, depressive disorder, and anxiety disorder as severe impairments. (*Id.*). At Step Three, the ALJ found Ms. Stewart's impairments did not meet or medically equal the requirements of a listed impairment. (*Id.*). At Step Four, the ALJ determined Ms. Stewart had the RFC to perform light work with the following restrictions:

> She can lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently. She can sit for six hours, stand for six hours, and walk for six hours in a workday. The claimant can climb ramps and stairs occasionally. She can never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch, and crawl. The claimant can never work at unprotected heights or around dangerous moving machinery. She can understand, remember, and carry out and complete simple, repetitive tasks, with no fast production-rate pace requirements. She can adapt to occasional and superficial interactions with supervisors, coworkers, and the public, where superficial is defined as involving no arbitration, negotiations, mediation, or being responsible for the safety or supervision of others. She can adapt to occasional and routine workplace changes.

(Tr. 4202). The ALJ then determined Ms. Stewart could not perform her past relevant work but could work as a cleaner/housekeeper, cleaner/polisher, and mail clerk and concluded she was not disabled between July 14, 2014, and April 30, 2021. (Tr. 4212-13).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

35

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters*, 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## DISCUSSION

Ms. Stewart raises three discrete issues for review. First, she asserts the ALJ erred in reviewing the medical opinions of Dr. Ranjan and Ms. Hart-Ogburn. (ECF #11 at PageID 4616). Second, she contends the ALJ "cherry-picked" the evidence and did not properly evaluate her pain and fibromyalgia and ignored substantial evidence of her compounding mental impairments. (*Id.*). Last, she argues the RFC is not supported by substantial evidence. (*Id.*). I address each argument in turn.

36

**I.      The ALJ did not properly evaluate the medical opinions.**

     **A.      The ALJ properly applied the treating-physician rule as Dr. Ranjan's and Ms. Hart-Ogburn's opinions were patently deficient.**

Because Ms. Stewart filed her application before March 2017, the ALJ's analysis of the medical opinions is governed by the treating-physician rule. The rule requires the Commissioner to generally:

> give more weight to opinions from treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [ ] medical impairment(s) and may bring a united perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative evaluations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). A treating physician's opinion is entitled to "controlling weight" when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* If the ALJ declines to give a treating physician controlling weight, the ALJ must "always give good reasons" for the weight given to the treating source. *Id.* The reasons must be supported by the evidence in the record and must be sufficiently specific to make clear the weight the ALJ gave to the treating source's opinion and the reasons for that weight. *Wilson,* 378 F.3d at 544.

"It is not enough for the ALJ to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Friend v. Comm'r of Soc. Sec.,* 375 F.App'x 543, 552 (6th Cir. 2010). If the ALJ does not give controlling weight, the ALJ must determine what weight to give to the treating physician's opinion by "apply[ing] certain factors—namely, the length of the treatment relationship and the frequency of

examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson,* 378 F.3d at 544.

If the ALJ does not give good reasons for declining to give a treating physician's opinion controlling weight, the district court "will reverse and remand a denial of benefits, even though 'substantial evidence otherwise supports the decision of the Commissioner.'" *Friend,* 375 F.App'x at 551 (citation omitted). "[A]n ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Id.* But a district court may conclude that an ALJ's insufficient discussion may be harmless error if (1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has otherwise met the goal of the provision despite not complying with its terms. *Wilson,* 378 F.3d at 547. The Sixth Circuit has held that an opinion in checkbox form without an explanation supporting its conclusion is patently deficient. *Hernandez v. Comm'r of Soc. Sec.,* 644 F.App'x 468, 475 (6th Cir. 2016).

> The ALJ gave the opinion by Dr. Ranjan (Ms. Stewart's psychiatrist) little weight:
>
> Dr. Ranjan did not generally support his opinion, as he merely filled out a checkbox form. The other evidence of record is not fully consistent with his assessment because it supports a finding that the claimant is limited to simple, repetitive tasks, can have occasional and superficial interaction with others at work, and can adapt to occasional routine workplace changes. For example, a consultative examiner noted that the claimant was tearful and showed mild deficits in judgment but could perform serial 3 testing, spell a word backward, and recall at least two out of three words. Based on this analysis, Dr. Ranjan's assessment is given little weight.

(Tr. 4245-46).

For similar reasons, the ALJ gave the opinion of Ms. Hart-Ogburn (Ms. Stewart's counselor) little weight:

> Treating provider Kim Hart-Ogburn, MA, LPCC, reported that the claimant had mild to marked mental limitations. She did not support this opinion with objective findings, as she merely filled out a checkbox form. The other evidence of record is consistent with mild to moderate mental limitations because, as noted above, despite periods of increased symptoms, the claimant generally displayed normal grooming, average eye contact, average motor activity, a cooperative demeanor, normal speech, normal thought content, logical thought processes, a full affect, intact cognition, average intelligence, normal memory, at least fair insight and judgment, and normal impulse control. As such, the above assessment is given little weight.

(Tr. 4246).

Ms. Stewart argues the ALJ did not give good reasons for assigning little weight to the opinions of Dr. Ranjan and Ms. Hart-Ogburn, especially the opinion that Ms. Stewart can rarely (or minimally) interact with supervisors and others. (ECF #11 at PageID 4640). The Commissioner contends the opinions are patently deficient because Dr. Ranjan and Ms. Hart-Ogburn merely identified Ms. Stewart's mental health diagnoses and placed checkmarks to show the degree of functional limitation in the areas of mental functioning without indicating what evidence supported those limitations. (ECF #14 at PageID 4667).

The Commissioner is correct that both Dr. Ranjan and Ms. Hart-Ogburn provide checkbox opinions that did not cite any medical evidence beyond Ms. Stewart's diagnoses or offer information other than the date Ms. Stewart began treatment. (*See* Tr. 817-18, 1249-50). Although Dr. Ranjan's form does not ask for anything beyond diagnoses, Ms. Hart-Ogburn's form asks for "medical and clinical findings that support the assessment" and it cautions an explanation of the supporting medical and clinical findings is "imperative" and "a simple recitation of the diagnosis will not be sufficient." (*Contrast* Tr. 818 *with* Tr. 1250). Despite the warning, Ms. Hart-Ogburn

merely recites the diagnoses. (Tr. 1250). Thus, I agree those opinions meet the definition of "patently deficient" and find that any failure of the ALJ to provide good reasons for rejecting them is harmless error. *See Hernandez,* 644 F.App'x at 475.

> **B.** **The ALJ did not properly analyze the other medical opinions.**

Nevertheless, the ALJ's decision must be remanded because the ALJ did not explain why certain functional limitations from other medical opinions concerning Ms. Stewart's diminished abilities to tolerate others and respond to supervision were not accepted and incorporated into the RFC.

Step Four of the sequential analysis requires the ALJ to determine a claimant's RFC after considering all the medical and other evidence of record. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC assessment must always consider and address medical-source opinions as Social Security Ruling (SSR) 96-8p provides, "If the RFC conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." 1996 WL 374184, at *7 (July 2, 1996). Here, the ALJ determined Ms. Stewart can "adapt to occasional and superficial interactions with supervisors, coworkers, and the public." (Tr. 4238). Yet the ALJ noted two state agency psychological consultants determined Ms. Stewart can "tolerate others on a minimal and superficial basis." (*See* Tr. 4244). And the ALJ noted consultative examiner Dr. Konieczny determined Ms. Stewart has "a diminished ability to respond appropriately to coworkers and supervisors and to respond to workplace pressure." (*See* Tr. 4245).

The ALJ gave these state agency consultants' opinions partial weight but concluded Ms. Stewart is limited to occasional and superficial interaction because she often maintained average eye contact during her medical appointments and was normally well-groomed, with normal

40

thought content and cooperative behavior even though she was tearful, angry, and hostile, with abnormal thought processes, an abnormal mood, racing thoughts, and rapid speech. (Tr. 4244-45). Notably, Ms. Stewart was often tearful and angry, even when she was noted as well-groomed and cooperative. (*See, e.g.,* Tr. 719-24 ("somewhat tearful during examination," "well-groomed," "cooperative"); Tr. 729-30 ("cried for a few minutes and then raised her voice," "well-groomed," "logical thought process," "cooperative"); Tr. 740-41 ("depressed and angry mood," "well-groomed," "logical thought process"); Tr. 756-760 ("very tearful during exam," "well-groomed," "cooperative"); Tr. 1161-62 ("tearful during visit"; "well-groomed"; "cooperative"); Tr. 1313-14 ("had several crying spells during the visit"; "well-groomed"; "cooperative"); Tr. 1408-11 ("tearful"; "well-groomed"; "average eye contact"; "cooperative"); Tr. 3690 ("oddly overly cooperative at times" but "appeared spiteful at times, vengeful, and hostile")). For Ms. Stewart, being well-groomed and cooperative is not mutually exclusive of her being tearful, angry, or hostile. This leaves the lingering question of how those findings are inconsistent with one another. The ALJ offers no explanation. It is easy to see how being tearful, angry, hostile, and moody could negatively affect a person's ability to work with others and respond to supervision. It is less apparent, and the ALJ offers no explanation for, how being well-groomed and cooperative with a logical thought process shows a greater ability to work with others and respond to supervision despite the frequent tears, anger, and hostility.

Similarly, the ALJ gave Dr. Konieczny's assessment partial weight because other evidence was consistent with assessing more restrictive limitations in the areas of understanding, remembering, and applying information and concentrating, persisting, or maintaining pace. (Tr. 4245). Once again, the ALJ did not explain why Dr. Konieczny's assessment of Ms. Stewart's

41

diminished ability to respond to coworkers and supervisors and workplace pressure was not incorporated into the RFC. Thus, the ALJ has not properly evaluated the medical opinions in this case. *See* SSR 96-8p, at *7 (explaining that if the RFC conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted). These errors are not harmless, making remand necessary.

**II.     The ALJ did not properly evaluate Ms. Stewart's symptoms.**

Next, Ms. Stewart contends the ALJ did not properly evaluate her pain and fibromyalgia and did not meaningfully address the substantial evidence showing that her mental health impairments compounded her physical symptoms. (ECF #11 at PageID 4643). She begins with the ALJ's summary of the medical record, stating the ALJ distilled more than 4,000 pages of records into several paragraphs without meaningful review. (*Id.* at PageID 4644). Second, Ms. Stewart argues the ALJ "failed to consider how Ms. Stewart's psychiatric impairments exacerbated her physical symptoms" and ignored evidence establishing the diagnosis of fibromyalgia. (*Id.*).

In response, the Commissioner states that substantial evidence supports the ALJ's evaluation of Ms. Stewart's subjective complaints, and the evidence does not meet the American College of Rheumatology's criteria for a fibromyalgia diagnosis. (ECF #14 at PageID 4671-73).

**A.     The ALJ did not analyze the impact of fibromyalgia when the record presented evidence of the condition.**

The Sixth Circuit has long recognized that fibromyalgia may be a "severe impairment." *See, e.g., Preston v. Sec'y of Health & Hum. Servs.*, 854 F.2d 815, 818 (6th Cir. 1998). Social Security Ruling (SSR) 12-2p "provides guidance on how the [Social Security Administration] develop[s] evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how [to] evaluate fibromyalgia in disability claims. SSR 12-2p, 2012 WL 3104869, at *2 (July 25,

2012). SSR 12-2p defines fibromyalgia as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." *Id.*

The ALJ's analysis of a claimant's fibromyalgia begins at Step Two, where the ALJ must consider whether a claimant's impairment constitutes a severe, medically determinable impairment. When considering fibromyalgia, the ALJ cannot rely on a diagnosis alone; rather, the evidence must show that a physician reviewed the person's medical history and conducted a physical examination. *Herzog v. Comm'r of Soc. Sec.*, No. 2:16-cv-244, 2017 WL 4296310, at *2 (S.D. Ohio Sept. 28, 2017). A claimant's fibromyalgia is considered a medically determinable impairment "if the physician diagnosed [fibromyalgia] and provides the evidence described in the American College of Rheumatology's (ACR) 1990 Criteria for Classification of Fibromyalgia or the ACR's 2010 Preliminary Diagnostic Criteria, and the physician's diagnosis is not inconsistent with the other evidence in the person's case record." SSR 12-2p, at *2. Under the 1990 criteria, a claimant must demonstrate:

> (1)     a history of widespread pain in all quadrants of the body for at least three months;
>
> (2)     at least eleven positive tender points found bilaterally on the left and right sides of the body on physical examination; and
>
> (3)     evidence that other disorders that could cause the symptoms were excluded.

*Id.* at *2-3. Under the 2010 criteria, a claimant must demonstrate:

> (1)     a history of widespread pain;
>
> (2)     repeated manifestations of six or more fibromyalgia signs or symptoms, such as fatigue, memory or cognitive problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and

(3)      evidence that the other disorders that could cause the symptoms were excluded.

*Id.* at *3.

Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and elimination of other diagnoses." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 (6th Cir. 2007). "[P]hysical examinations will generally yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." *Preston v. Sec'y of Health & Hum. Servs.*, 854 F.3d 815, 818 (6th Cir. 1988). Because physical examinations are less useful in the diagnosis of fibromyalgia or determining its severity, the ALJ's symptom evaluation is important. "Opinions that focus solely upon objective medical evidence are not particularly relevant" due to "the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia." *Rogers*, 486 F.3d at 245.

Evaluating an individual's subjective symptoms is a two-step process. *See* SSR 16-3p, 2017 WL 5180304, at *3 (Mar. 24, 2016). First, the ALJ must consider whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second step, the ALJ may consider evidence directly from the claimant or gleaned from other medical and non-medical sources. *Id.* Non-medical sources may include "public and private agencies, other practitioners, education personnel, non-medical sources such as family and friends, and agency personnel." *Id.* at *7. Regarding non-medical sources, ALJ's are specifically directed to:

44

[C]onsider any statements in the record noted by agency personnel who previously interviewed the individual, whether in person or by telephone. The [ALJ] will also consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file.

*Id.*

In evaluating the limiting effects of the claimant's symptoms, the ALJ must consider all evidence in the record including: daily activities; the location, duration, and frequency of the alleged symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of medication; treatment other than medication; other efforts made to alleviate the symptoms; and other factors regarding the claimant's functional limitations. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ determines the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR 16-3p, 2017 WL 5180304, at *2. An ALJ need not accept a claimant's subjective complaints, *Jones*, 336 F.3d at 476, and need not "make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F.App'x 496, 508 (6th Cir. 2006). In practice, this means the ALJ must make clear to the claimant and those reviewing the decision why the ALJ rejected probative evidence supporting a finding of disability. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (stating that ALJ's failure to explain more, aside from a conclusory analysis, denotes a lack of substantial evidence, even where the record may justify the ALJ's conclusion).

The regulations require the ALJ to evaluate a claimant's symptoms, and the explanation must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the

45

weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers*, 486 F.3d at 248; *see also* SSR 16-3p, 2017 WL 5180304, at *10. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-cv-1617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). Absent compelling reason, a court may not disturb the ALJ's analysis of the claimant's subjective complaints or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-cv-98, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019).

Here, the ALJ acknowledged Ms. Stewart's complaints of pain and that she received pain medication but then failed to specifically assess her fibromyalgia—whether by stating that he did not find it to be a severe impairment or detailing that he considered the effects of her fibromyalgia in the RFC determination. And in evaluating Ms. Stewart's symptoms, the ALJ focused largely on normal physical examinations, the relief Ms. Stewart experienced with trigger point injections, and her ability to prepare simple meals, occasionally engage in household chores, manage her own finances, and perform her own shopping to conclude that "the medical evidence and other evidence in the record is not consistent with the claimant's allegations regarding her symptoms." (Tr. 4244). The ALJ's failure to consider Ms. Stewart's fibromyalgia at Step Two and in evaluating her symptoms constitutes reversible error. "When the record presents evidence of fibromyalgia, the Sixth Circuit has not hesitated to remand or reverse administrative decisions that fail to consider, or apply incorrect standards to, the condition." *Partlow v. Comm'r of Soc. Sec.*, No. 2:11-cv-00066, 2012 WL 936341, at *8 (S.D. Ohio Mar. 20, 2012) (citing *Rogers*, 486 F.3d at 244).

Here, the record presents a close call on whether Ms. Stewart can establish a diagnosis of fibromyalgia as contemplated in SSR 12-2p. There are a few documents reflecting a diagnosis of

and treatment for fibromyalgia. (*See* Tr. 2746-53 (diagnosis); Tr. 2753 (group therapy for fibromyalgia); Tr. 3589 (pain management); Tr. 3640 (pain management)). In June 2019, Ms. Stewart received a referral to consult with a doctor about possible fibromyalgia. (Tr. 2769). Dr. Chatterjee evaluated Ms. Stewart on October 22, 2019 and reviewed recent blood work showing no concern for issues that might otherwise explain her symptoms. (Tr. 2747-48). During the appointment, Ms. Stewart endorsed fatigue, redness in her eyes, swelling in her legs or feet, nausea, heartburn, joint pain, morning stiffness in joints, muscle weakness, back pain, headaches, depression, and memory loss. (Tr. 2748-49). She had tenderness in her shoulders, lower back, and trochanters. (Tr. 2752). For treatment, she received trigger point injections in the bilateral biceps, deltoids, thighs, lumbar paraspinal muscles, and left-sided cervical paraspinal muscles. (Tr. 3598, 3607, 3669, 4157, 4163). She also received prescriptions for Lyrica and gabapentin for her pain. (Tr. 3660, 3876). Because the record presents evidence of fibromyalgia and the ALJ did not consider the condition, remand is warranted for the ALJ to make the appropriate determination in the first instance.

> **B.** **The ALJ also erred in evaluating Ms. Stewart's testimony about her mental health.**

I also find error in the ALJ's evaluation of Ms. Stewart's mental health symptoms. In this case, the ALJ limited her review of Ms. Stewart's statements to those she made at the most recent hearing and responses in an Adult Function Report, stating:

> The claimant has alleged disability due to pain all over her body, worse in the legs, back, and shoulders, along with mental health issues. She said that she had trouble lifting more than two pounds, squatting, bending, standing, reaching, walking more than five feet, sitting, kneeling, and climbing stairs. In terms of her mental health, the claimant reported panic and anxiety attacks, and she said that she was often aggressive with others. Further, she reported difficulty remembering, completing tasks, concentrating, understanding, following instructions, being alone in public, and handling stress.

(Tr. 4239). After summarizing the medical evidence, the ALJ determined Ms. Stewart's statements about the intensity, persistence, and limiting effects of her mental health symptoms are inconsistent with the medical evidence and other evidence of record:

> Regarding her mental health, despite periods of increased symptoms, the claimant generally displayed normal grooming, average eye contact, average motor activity, a cooperative demeanor, normal speech, normal thought content, logical thought processes a full affect, intact cognition, average intelligence, normal memory, at least fair insight and judgment, and normal impulse control. At a consultative examination in January of 2016, the claimant was pleasant and cooperative, with adequate grooming and hygiene, an adequate level of motivation and participation, normal speech, appropriate eye contact, no impairment in her ability to concentrate and attend to tasks, an ability to perform serial 3 testing, recall two out of three objects after a delay, and spell a word backward, intact general fund of information, and fair insight. In June and September of 2016, the claimant was noted to show fair hygiene, engaged behavior, a stable mood, and logical thought processes. In August and October of 2017, the claimant was noted to be much improved. During this period, the claimant began taking medication, and she was noted to be stable. In September of 2018, the claimant reported improvement in her symptoms with new medication she was prescribed at the hospital. In June of 2019, the claimant reported that her mood felt stable in general, with improvement in her depression and anxiety. In June of 2020, the claimant denied a depressed mood, noting that she had recently gone out with a friend and felt good. Finally, the claimant reported that she could prepare simple meals, do laundry, do dishes, perform light sweeping, and handle money. In January of 2016, the claimant told a consultative examiner that she could attend to her own hygiene, prepare herself meals, engage occasionally in household chores, occasionally involve herself in church, perform her own shopping, and manage her own finances. In sum, the medical evidence and other evidence in the record is not consistent with the claimant's allegations regarding her symptoms.

(Tr. 4243-44).

This lengthy explanation might constitute substantial evidence for finding Ms. Stewart's statements to be inconsistent with medical and other evidence of record if the court had confidence that the ALJ considered all of the evidence. But in this case, there is no indication the ALJ reviewed and considered the observations of other mental health sources, such as from Ms. Stewart's other providers at Charak and Ohio Guidestone, that appear consistent with Ms.

Stewart's statements about the effects of her conditions. For example, from 2019 and to 2021, Ms. Stewart met with Mr. Pyle who often noted Ms. Stewart's abnormal behavior, such as hostility towards others, anger and irritability, restlessness in her chair, pain behaviors (grimacing, clenching her fists, slouching, frowning, grunting, groaning), and tearfulness. (*See* Tr. 2287, 2255, 2252, 2244, 3030, 3035, 2947, 2942, 2927, 2916, 3176, 3352, 3345, 3713, 3623, 3695, 3694, 3691) (in chronological order). In addition to abnormal behaviors, Mr. Pyle also explained Ms. Stewart was resistant to change her behavior and resorted to anger (*See* Tr. 2245, 2927, 3696, 3344, 3692). In 2020, Ms. Stewart sought additional mental health treatment and re-engaged with Ohio Guidestone. She spoke with a case manager or a therapist by phone more than 75 times that year. During those conversations, the provider noted she was often crying, distraught, angry, and agitated. (*See* Tr. 2353, 3374, 3378, 3256, 3258, 3265, 3268, 3274, 3277, 3280, 3286, 3289, 3301, 3306, 3518, 3524, 3542, 3550, 3574, 3902, 3911, 3920, 3926, 3938, 3944, 3947, 3956, 3959, 3968).

Those observations appear to support the state agency consultants' opinions that Ms. Stewart needs minimal contact with others and appear consistent with Ms. Stewart's statements that she often cries excessively and struggles to control her emotions. But the ALJ never discussed the content of those records. I note the ALJ need not discuss every piece of evidence in the medical record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F.App'x 496, 507-08 (6th Cir. 2006) ("[A]n ALJ can consider every piece of evidence without addressing [all the evidence] in his opinion."). In this case, however, it is not clear that the ALJ's "factual findings as a whole show that [he] implicitly considered the record as a whole." *Id.* The ALJ faced a tall order with considering a record of over 4,000 pages documenting seven years of frequent care. And while it is fair to say Ms.

49

Stewart experienced some improvements in certain symptoms over the course of her treatment, the records the ALJ did not explicitly address (and perhaps did not consider at all) throughout the period in question continue to reflect significant abnormal functioning and Ms. Stewart's struggles with her mental impairments, despite those improvements. For those reasons, the case must be remanded to the Commissioner.

CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I **REVERSE** the Commissioner's decision and **REMAND** the matter for additional proceedings not inconsistent with this Order.

Dated: March 24, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE